**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**


| | |
|---|---|
| Alison Gordon, et al.,     ) | **CASE NOS.**   **5:09 CV 2687** |
| ) | **5:10 CV 1431** |
| ) | |
|            **Appellants,**   ) | **JUDGE PATRICIA A. GAUGHAN** |
| ) | |
|       **vs.**     ) | |
| ) | |
| **David Wehrle, Liquidation Trustee,**   ) | |
| **Successor-in-Interest to Official**   ) | |
| **Committeeof Unsecured Creditors,**   ) | |
| ) | **Memorandum of Opinion and Order** |
|         **Appellee.**   ) | |


**INTRODUCTION**

This matter is before the Court upon Alison Gordon and David Gordon's appeal of the September 30, 2009 Memorandum of Opinion and Order of the Bankruptcy Court sustaining the trustee's objection to their claim, and the May 12, 2010 Order of the Bankruptcy Court granting the Liquidation Trustee's Motion to Strike (Doc. 24).  Briefing in these two cases has been consolidated.  For the following reasons, the decisions of the Bankruptcy Court are AFFIRMED.


**FACTS**

1

Appellants, siblings Alison Gordon and David Gordon, bring this bankruptcy appeal against appellee, David Wehrle, Liquidation Trustee and successor in interest to the Official Committee of Unsecured Creditors.  This bankruptcy appeal arises from the voluntary Chapter 11 filings of Darlington Nursing & Rehabilitation Center, Ltd. (hereinafter "Darlington") and Dani Family, Ltd. (hereinafter "Dani") (collectively referred to as "Dani/Darlington" and sometimes referred to by appellants as "debtors").

After the evidentiary hearing on appellants' claim on June 30, 2009, the Bankruptcy Court found the following facts, which are taken from the Bankruptcy Court's September 30, 2009 Order:

1. On February 12, 2008, Royal Manor Management, Inc. ("Royal Manor") filed with this Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code and was assigned Case Number 08-50421.

2. On March 4, 2008, Darlington Nursing & Rehabilitation Center, Ltd. ("Darlington"), WillowPark Convalescent Home, Inc., Blossom Nursing & Rehabilitation Center, Inc., and AMDD, Inc. (hereinafter collectively the "Debtor Operating Entities") filed with this Court voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

3. On April 22, 2008, this Court issued an Order of Joint Administration directing that the Chapter 11 cases of Royal Manor and the Debtor Operating Entities be consolidated for administrative purposes only.

4. Subsequently, the related entities of Austinburg Properties, Ltd., Willow Interests, LLC, 138 Mazal Health Care, Ltd., Dani Family, Ltd. ("Dani"), Broadway Care Center of Maple Heights LLC, and Brian Family Ltd. (hereinafter sometimes referred to collectively together with the Debtor Operating Entities as the "Related Entities"), each filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

5. Dani and Darlington were interrelated companies.  Darlington operated the nursing home which was located on the real property owned by Dani.

6. Sally and Abraham Schwartz (collectively "Schwartz") were the majority owners of Dani, Darlington, Royal Manor and the Related Entities.

2

7.    The Claimants are the niece and nephew of Schwartz.  The Claimants'
      mother is Gertrude Gordon, Sally Schwartz's sister.

8.    From May 25, 1994 through October 30, 1996, David, Alison and/or
      Gertrude Gordon loaned money to Schwartz on five (5) occasions, as
      follows:

      a.    Promissory Note for $250,000,00 of Schwartz to David
            Gordon dated May 25, 1994;

      b.    Promissory Note for $250,000.00 of Schwartz to David
            Gordon dated September 9, 1994;

      c.    Promissory Note for $500,000,00 of Schwartz to David
            Gordon dated September 9, 1994;

      d.    Promissory Note for $225,000.00 of Schwartz to Alison
            Gordon dated October 1, 1995; and

      e.    Promissory Note for $350,000.00 of Schwartz to Gertrude
            Gordon dated October 30, 1996.

      f.    The above Promissory Notes were replaced by a single
            Promissory Note for $1,550,000.00 of Schwartz to
            Gertrude Gordon dated January 1, 2000.

9.    The Gordons agree that the obligations referenced in the immediately
      preceding paragraph are the personal obligations of Schwartz.

10.   In July, 2000, Gertrude Gordon sent two checks, Check Number 406 and
      Check Number 407, in blank except for her signature to Schwartz.  Both
      checks were drawn on an account in the names of Alison Gordon and
      Gertrude Gordon (hereinafter collectively the "Checks").

11.   Janet Grisanti [an employee of the nursing homes] typed the following
      information on the Checks pursuant to Sally Schwartz's instructions:
      "Sally Schwartz" on the payee lines, "for Dani Family" on the memo
      lines, and the amount of "$500,000" on each check.

12.   On July 27, 2000 the Checks were deposited into the "personal business
      account" [of] Schwartz at Bank One ending in 2936.

13.   Sally Schwartz used this "personal business account" to deposit money
      intended for one or more of her business entities, and from this personal

3

business account she would distribute the money to the various business
entities.

14. The designation "for Dani Family" on the memo lines of the Gordons'
    Checks meant that the $1 million was to be transferred to Dani.

15. The combined $1,000,000.00 transaction was evidenced by an
    "agreement" dated July 27, 2000 and notarized on August 24, 2000 (the
    "Agreement") which was executed by Schwartz personally.  *See* Exhibit 5.

16. The first line of the Agreement, the writing upon which [the] Gordons
    claim Dani/Darlington owes them money, reads, "Sally and Abraham
    Schwartz to Gertrude, David and Alison Gordon."  There is no mention of
    Dani or Darlington until paragraph 3(b), after provisions relating to 1) the
    January 1, 2000 promissory note for $1.5 million that the parties agree is a
    personal obligation of Schwartz and 2) the "Schwartz Family" agreement
    to provide nursing home care to Gertrude Gordon and Gerald Lorin
    (Gordon's second husband) at no cost.  Paragraph 3 provides, in pertinent
    part,

    David and Alison Gordon issued to the Schwartz's on 7/25/00
    $1,300,00.00 (sic).

    a)   $300,000.00 is to be returned to Gertrude Gordon on or
         before August 15, 2000.

    b)   The $1,000,000.00 is an investment by the Gordon's in the
         Darlington Nursing Home. The following are the benefits
         of this investment:
         -The principal investment is to be returned to
         Gordon on or before 7/25/2002. Collateral for this
         shall be a 50% interest in P.S. Realty. . . .
         - 10% cumulative interest while the $1,000,000.00
         is invested payments to be made when the bank
         says we can take money out.
         10% equity ownership (5% to Alison and 5% to
         David).
         10% Annual profit (guaranteed by the Schwartz's to
         be a minimum of $50,000.00 annually. Payments to
         be made when debt service covenant is met and
         bank allows money to be taken out.

    In addition, Schwartz signed the Agreement personally, in the
    exact same manner as the six promissory notes which the Gordons

agree were the personal obligation of Schwartz.  There is nothing on the face of the Agreement which reflects that Schwartz executed the Agreement in a representative capacity for Dani, Darlington, Royal Manor or any other Related Entity.

17.    Gertrude Gordon negotiated this transaction on behalf of her children Alison Gordon and David Gordon.

18.    No promissory note was ever prepared or executed in relation to this $1 million transaction.

19.    The Gordons received Schedule K-ls from Dani for the tax years 2000, 2001 and 2002.  The Schedule K-1s reflect Dani's treatment of the $1 million as a capital contribution ($500,000 from Alison Gordon and $500,000 from David Gordon).  The Gordons never once contacted Schwartz or Dani to dispute the issuance or accuracy of the K-1 Schedules.

20.    The Gordons never received any of the payments they claim to be due under the Agreement.  The Gordons never filed any litigation concerning the default on the Agreement before filing their original Claim in these proceedings.

21.    David Gordon said he understood from conversations with his mother that the transaction reflected by the Agreement was a loan with an "equity kicker" in Dani and Darlington.

22.    On or about June 1, 2007, Benesch Friedlander Coplan Aronoff LLP ("Benesch"), then acting as counsel for Royal Manor, Dani, Darlington and the Related Entities, sent to the Gordons a letter requesting the Gordons consent to the proposed sale of Darlington and Dani to Orion Care Services, LLC ("Orion").  In the course of the ensuing negotiations between Benesch and the Gordons over the Orion sale, the Gordons were not represented by counsel.  Gertrude Gordon, a non-attorney who held power of attorney for her children with respect to this transaction, negotiated for the Gordons.  Several emails were exchanged between attorneys associated with Benesch and Gertrude Gordon.

23.    On June 13, 2007, at the behest of Gertrude Gordon, Schwartz signed a letter on Benesch letterhead which was sent to Gertrude Gordon.  The letter details the understanding between Schwartz and Gordon regarding the Agreement and the treatment the Gordons were to receive as a result of the $1 million transaction if the sale of Dani and Darlington to Orion (the "Orion Transaction") was completed.  The first numbered paragraph of the

5

letter says that "the initial investment is $1 million plus accrued interest and shall be paid when Abraham and Sally Schwartz have the ability to do so."  The letter further reflects that proceeds from the Orion Transaction would be used to pay the "mortgagees, secured creditors, trade creditors and related costs" first.

24.  After receiving the letter from Schwartz, the Gordons, through Gertrude Gordon as their attorney-in-fact, executed an action by unanimous written consent as members of Darlington and Dani for the purposes of consenting to and permitting Orion and its related entities to purchase Darlington and Dani and other Related Entities.

25.  At the time of the hearing in this matter, Alison Gordon was 30 years old. She is a well educated young professional.  She is currently a vice president of Nomura Securities, a Japanese bank, at the mortgage backed securities desk.  Previously, she worked as an auditor for Deloitte & Touche in its banking group.  On June 20, 2008, Alison Gordon executed a durable general power of attorney granting Gertrude Gordon permission to act as her attorney-in-fact as to her business matters.

26.  At the time of the hearing in this matter, David Gordon was 34 years old. He is a well educated young professional.  He currently works for Auriga, a small hedge fund and bank based in Spain.  Previously he worked for Morgan Stanley at its mortgage backed securities desk, MBNA, and Lehman Brothers.  On June 20, 2008, David Gordon executed a durable general power of attorney granting Gertrude Gordon permission to act as his attorney-in-fact as to his business matters.

27.  Gertrude Gordon, the mother of the Claimants, has a B.S. and a Masters Degree in Early Childhood Education.  Her first husband, the father of the Claimants, was a lawyer.  Upon his death, Gertrude Gordon became involved in contentious litigation with her dead husband's law partners over his partnership interest.  Mr. Grossman represented Gertrude Gordon in that litigation. Gertrude Gordon's second husband, Gerald Lorin, is a retired dentist.

At the June 30 evidentiary hearing, the parties stipulated that the Agreement was clear on its face and unambiguous, and that introducing parol evidence for the purpose of interpreting the Agreement would therefore be inappropriate.  (June 30, 2009 Tr. 71:4-72:6).  The following facts are also relevant.  Appellants filed a proof of claim estimated at $2,142,200 against

6

Darlington on June 26, 2008.  The claim was supported by the Agreement referenced above.

Appellee objected to the claim.  On January 13, 2009, appellants filed a Motion to Amend the

claim to state it with greater particularity and to add a claim for unpaid dividends.  During

discovery and after January 13, 2009, appellants claim they became aware for the first time of

operating agreements for Dani and Darlington on which appellants' signatures are forged.  The

Dani operating agreement describes appellants' $1 million transfer as an initial capital

contribution and classifies appellants as priority members.  The Dani operating agreement also

provides for repayment of capital contributions to priority members in increments of 10% of the

members' contributions over a certain period of time until the capital contributions are reduced

to zero.  On March 17, 2009, based on the discovery of the operating agreements, appellants

filed a Motion to File New Claim for rescission, unjust enrichment, and/or an alternative claim

that the operating agreement converted 10% of appellants' equity into a loan every year.  The

Bankruptcy Court denied the Motion to Amend and the Motion to File New Claim at a May 12,

2009 hearing.  Appellants appealed the order denying the Motion to File New Claim to this

Court, which affirmed the Bankruptcy Court's decision (Case No. 5:09 CV 1506, Doc. 26).

The Bankruptcy Court sustained appellee's objection to appellants' claim in its

September 30, 2009 Memorandum of Opinion and Order following the June 30 evidentiary

hearing, holding that the Agreement represented a personal obligation of Schwartz, not an

unsecured claim against Dani/Darlington.  The Bankruptcy Court also held that the transaction

evidenced by the Agreement was at most a capital contribution in Dani/Darlington, not a loan.

Appellants appealed to this Court.  In designating the record on appeal, appellants designated

appellee's exhibit list of potential hearing exhibits for the June 30 hearing and provided it to the

7

clerk as the document was not offered as an exhibit during the hearing by appellants or appellee. Appellee moved to strike the document and the Bankruptcy Court granted the motion on May 12, 2010, holding that the it was not relevant to the Bankruptcy Court's substantive ruling; therefore, the exhibit list should be stricken from the record on appeal.

## STANDARD OF REVIEW

Fed. R. Bankr. P. 8013 sets forth the standard of review to be applied by district courts in resolving bankruptcy appeals:

> On an appeal the district court or bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.

"On the basis of this Rule, the Court must accept [the bankruptcy judge's] findings of fact unless they are found to be clearly erroneous."  *In re G-P Plastics, Inc.,* 320 B.R. 861, 864 (E.D. Mich. 2005).  "However, her conclusions of law are not entitled to the same deference and are subject to de novo review."  *Id.* (citing *In re Batie*, 995 F.2d 85, 88 (6th Cir. 1993)).  *See also In re Wolf*, 331 B.R. 256, 260 (E.D. Mich. 2005) ("The appropriate standard of review of the bankruptcy court's conclusions of law is de novo.  In contrast, findings of fact entered by the bankruptcy court will not be set aside unless clearly erroneous, with due regard given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." (citations omitted)).

## ISSUES PRESENTED BY APPELLANTS

**1.**     **Did the Bankruptcy Court err in holding that the Gordons' $1 million advance was not to debtors in bankruptcy, but instead was to debtors' individual principals,**

8

> **where the parties' stipulations showed that the $1 million advance was always intended for the debtors, was routed to the debtors' account through a conduit account, actually reached and was deposited into the debtor's [sic] account, was implemented through 2 checks with debtor's [sic] name of the memo lines of the checks to indicate that the money was intended for debtors, and was recorded on the debtors' books and records as reaching the debtors and as a transaction with the debtors?**

The Court reviews this issue *de novo*, as the interpretation of a contract is a question of law.  As an initial matter, appellants attempt to argue that they need not rely on the Agreement for their recovery, but may instead prove that their claim is a loan to Dani/Darlington using the entire record, and that "any combination of documents, testimony and/or stipulations which shows a $1 million loan to Darlington/Dani should entitle [appellants] to prevail, regardless of whether the combination includes the single document attached to the original claim." Appellants further point to the Bankruptcy Court's statement during the May 12, 2009 hearing that although it was denying the motion to amend the claim, it would give appellants tremendous latitude to develop alternative theories in relation to the exchange of funds that would support appellants' attempt to be treated as creditors in this case.  (May 12, 2009 Tr. 66:11-68:17.)  This language, appellants argue, means that they are not limited to a document or theory but can use the full record to prove their claim.  Finally, appellants argue that if they are not permitted to use the full record to argue that their claim is a loan to the debtors, this Court should reverse the Bankruptcy Court's denial of the motion to amend the claim as an abuse of discretion.

Appellee argues that appellants are bound by the stipulation they made at the June 30, 2009 hearing that the Agreement is unambiguous and needs no parol evidence for its interpretation.  Appellee further argues that appellants chose not to present evidence in support of their amended and new claim theories at the hearing.

9

Appellants reply that the additional factual and legal bases that they presented at the evidentiary hearing included:  the two checks drawn on the Gordon account totaling $1 million with "for Dani Family" on their memo lines; a description of how the checks were signed in blank by Gertrude Gordon and then completed by a nursing home employee; a statement of Gertrude Gordon's intent in signing and sending the checks; and a detailed factual description of this evidence.  Appellants also cite to the hearing transcript showing that they argued the existence of the Schedules K-1 supported their contention that the $1 million transaction was a loan to Dani/Darlington, not a transaction with Schwartz.  Appellants further argue that appellee "admits" that the parol evidence rule would not have barred their amended claim, then changes his position and argues that the stipulation bars consideration of the checks and stipulated facts. Finally, appellants argue that fairness and equity, common sense, and appellee's "own standards at trial" support their argument that they should be permitted to present parol evidence.

Upon review, the Court agrees with appellee and with the Bankruptcy Court.  Appellants stipulated that the Agreement was unambiguous and that use of parol evidence is inappropriate to determine its meaning.  Parol evidence is, of course, evidence of prior or contemporaneous negotiations offered to prove the meaning of a contract. *Galmish v. Cicchini,* 734 N.E.2d 782, 788 (Ohio 2000) ("The parol evidence rule states that 'absent fraud, mistake or other invalidating cause, the parties' final written integration of their agreement may not be varied, contradicted or supplemented by evidence of prior or contemporaneous oral agreements, or prior written agreements.'").  This stipulation occurred at the evidentiary hearing on June 30, 2009, after the Bankruptcy Court ruled at the May 12, 2009 hearing that appellants would be given tremendous latitude to develop alternative theories in support of their claim.  Thus appellants were fully

10

aware of the Bankruptcy Court's ruling when they stipulated that the Agreement was

unambiguous.  Further, they do not argue that they were prevented from introducing any non-

parol evidence relating to the Agreement in contravention of that prior ruling.  Accordingly, as

the Bankruptcy Court determined in footnote 5 of its opinion, parol evidence will not be

considered in determining the meaning of the Agreement.[1]

The parties agree that the Agreement is clear and unambiguous on its face.  Appellants

argue that the Bankruptcy Court improperly focused solely on the signatures of the Agreement to

determine that it showed a personal obligation of Schwartz, and that "the economic substance

and overall content of the document, not the form of signature alone, are controlling."  They

argue that paragraph 3(b) of the Agreement overwhelmingly shows an obligation of

Dani/Darlington rather than Schwartz for the following reasons:  it describes an investment in

---

[1]     The Court does not find that the stipulation the parties entered into with respect to parol evidence is inconsistent with the Bankruptcy Court's May 12, 2009 statements that appellants could pursue alternative legal theories.  Appellee identifies the denial of appellant's Motion to Amend Claim as a separate issue on appeal:  "[W]hether any reversible error occurred as a result of the Bankruptcy Court's 'denial' of the Appellants' motion for leave to file an amended claim, when the Appellants were expressly told in advance of the evidentiary hearing that they could present *any theories* of recovery to establish that they had a valid claim?"  The Court reviews this issue for abuse of discretion.  An abuse of discretion exists when the reviewing court is firmly convinced that a mistake has been made.  A court "abuses its discretion when it relies on clearly erroneous findings of fact, or when it improperly applies the law or uses an erroneous legal standard."  *Romstadt v. Allstate Ins. Co.,* 59 F.3d 608, 615 (6th Cir. 1995).  The Bankruptcy Court did not do so here and, in fact, invited appellants to present all theories that would support their claim at the June 30, 2009 hearing.  (May 12, 2009 Tr. 66:11-68:17.)  That appellants then chose to stipulate that the Agreement was unambiguous and parol evidence was inappropriate to determine the meaning of the Agreement does not convert the earlier ruling of the Bankruptcy Court denying the Motion to Amend Claim into an abuse of discretion.  Accordingly, the Court finds it unnecessary to address appellee's arguments relating to res judicata, collateral estoppel, and harmless error, and appellants' replies thereto, as they relate to the Bankruptcy Court's order on the Motion to Amend Claim.

the Darlington Nursing Home which is to be returned to appellants two years later; it provides for 10% interest while the money is invested in Darlington, which appellants argue means that Darlington is responsible for paying the interest; the interest payments depend upon the financial success of Darlington; it provides for the payment of dividends; and includes a personal guarantee by Schwartz of $50,000 in dividends per year.[2]

Appellee argues that under Ohio law, an individual has personal liability under a written instrument when the instrument fails to clearly identify the incorporated entity or principal which the person intends to obligate.  As only Schwartz signed the Agreement, and she did not sign it in a representative capacity, only Schwartz is obligated.  Appellee also argues that other aspects of the document indicate it is a personal obligation:  the title of the Agreement states "Sally and Abraham Schwartz to Gertrude, David, Alison Gordon"; paragraph one of the Agreement deals with a promissory note that is a personal obligation of Schwartz; paragraph two gives Gertrude Gordon and her husband the right to receive free nursing home care provided by the "Schwartz Family"; paragraph three states that "David and Alison Gordon issued to the Schwartz's [sic] on 7/25/00 $1,300,000" with $1 million of that amount representing the transaction at issue in this case; paragraph four states that "the Schwartz's [sic] agree to pay all costs that Gordon has incurred as a result of removing $1,300,000 from her accounts"; and paragraph five states that "Gordon to receive all legal documents from Schwartz attorney when complete."

Upon review, the Court affirms the ruling of the Bankruptcy Court.  Simply put, the

---

[2]     Appellants further argue that they cannot be blamed for the form of the signature on the document because they did not draft the document and are thus "not bound by the absence of an agency indicator in the signature block."  The Court finds this argument inapposite as no one has attempted to argue that appellants are liable for the amount of the Agreement.

Agreement does not bear any indication that Dani/Darlington is obligated to pay the amounts due under the Agreement.  It is well-settled under Ohio law that "when an agent signs a contract as an individual without adding the name of the principal, the agent is personally bound by the contract.  Similarly, a corporate officer is responsible for clearly identifying the corporation for which the officer is signing, or the officer is exposed to individual liability."  *West Shell Commercial v. NWS,* No. CA2006-06-154, 2007 Ohio App. LEXIS 409, at *4 (Ohio Ct. App. Feb. 5, 2007) (citing *Aungst v. Creque,* 74 N.E. 1073 (Ohio 1905)).  *See also Big H, Inc. v. Watson,* No. C-050424,  2006 Ohio App. LEXIS 3975, at *3-4 (Ohio Ct. App. Aug. 4, 2006) ("A corporate officer cannot simply provide his or her official title-the officer must write the corporate name. The typical format to avoid individual liability is 'company name, individual's signature, individual's position.'  If a corporate officer executes a contract in a way that indicates personal liability, then that officer is personally liable regardless of his or her intention.").[3]

The Agreement contains no indication that Dani or Darlington is bound by it.  First, it is signed by Schwartz in her individual capacity, as no indication exists otherwise.  It is titled as an agreement between Schwartz and appellants.  Even considering the economic substance of the document as a whole, it overwhelmingly points to a personal obligation of Schwartz:  the discussion of the promissory note that is a personal obligation of Schwartz; the promises by Schwartz of free nursing home care; the statement that appellants issued the money to Schwartz; and that Schwartz will be responsible for the costs associated with Gertrude Gordon withdrawing

---

[3]      Appellants cite heavily to *FDIC v. Tennessee Wildcat Services, Inc.,* 839 F.2d 251 (6th Cir. 1988).  *Tennessee Wildcat* applies Tennessee law.  Moreover, it applies the law of the Uniform Commercial Code on negotiable instruments, which does not apply in this case.  Appellants agreed with the Bankruptcy Court that the Agreement was not a negotiable instrument in the June 30, 2009 evidentiary hearing.  (June 30, 2009 Tr. 227:4-8.)

13

the money from her account all demonstrate a personal obligation.[4]

Moreover, appellants' arguments are not inconsistent with the Agreement representing a personal obligation of Schwartz:  appellee does not dispute that appellants had an equity interest in Dani/Darlington, but it does not automatically follow that *Dani/Darlington* was responsible to pay the sums due under the Agreement, regardless of the conditions attached to repayment. Appellants in their reply brief argue that the Schedules K-1 showing appellants' equity investment in Dani prove that the Agreement was with Dani/Darlington, but the Schedules K-1 are not conclusive on this issue– they show only that appellants have an equity interest in Dani/Darlington, a fact not in dispute.[5]  In the absence of any indication whatsoever that Schwartz was binding Dani/Darlington in this Agreement, the Court affirms the holding of the Bankruptcy Court.[6]

**2.** **Did the Bankruptcy Court err in holding that the Gordons' $1 million advance to debtors was an equity investment and not a loan, where the agreement expressly provided for full and unconditional repayment of the fixed $1 million principal by a date certain, provided for interest and collateral, and the overwhelming majority of factors used in the loan-vs-equity analysis shows a loan rather than equity**

---

[4]     Despite appellants' argument that "the economic substance and overall content of the document, not the form of signature alone, are controlling," appellants argue in their reply that paragraph 3(b) of the Agreement is the only relevant part of the document. Appellants further argue that if the other portions of the Agreement are relevant, that proves Schwartz signed the Agreement in a dual capacity, both for the company and as an individual. Appellants' argument is not well-taken, as appellants have presented absolutely no evidence that the Agreement was signed in anything other than an individual capacity.

[5]     Appellants also argue, when it suits them, that the Schedules K-1 are incorrect in that they show appellants hold equity in Dani/Darlington instead of showing a loan to Dani/Darlington.

[6]     It appears that the Bankruptcy Court did err in finding that Gordon testified that she lent money to her sister and not to Dani/Darlington.  Because the Court affirms the holding of the Bankruptcy Court based on the four corners of the Agreement, however, the error is irrelevant because the testimony is unnecessary to interpret the Agreement.

**investment?**

The Court reviews this issue for clear error, as the determination of whether an advance represents a capital contribution or a loan is a question of fact. *See Roth Steel Tube Co. v. Comm'r of Internal Revenue,* 800 F.2d 625, 629 (6th Cir. 1986). The Bankruptcy Court weighed the following factors in determining that the Agreement showed, at best, a capital contribution and not a loan:

> (1) the names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advances were used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide repayments.

*Bayer Corp. v. Mascotech, Inc. (In re Autostyle Plastics, Inc.),* 269 F.3d 726, 750 (6th Cir. 2001). Appellants have the burden to prove that these factors reflect a loan.

The Bankruptcy Court found that the fact that there is no promissory note on the part of appellants or Dani/Darlington strongly indicates that the advances were a capital contribution and not a loan. Appellants argue that the first factor requires only a written instrument of indebtedness, which is the Agreement itself, and thus the Bankruptcy Court erred in finding that this factor supports a capital contribution. Appellee argues that if the parties to the Agreement intended for it to be a loan, they would have used "loan" in the document title.[7] Appellee also

---

[7] Appellants devote a section of their brief to their argument that the term "investment" can mean either a loan or an equity investment. As the Bankruptcy Court did

15

points out that the parties to this Agreement previously entered into six promissory notes evidencing various loans, demonstrating that the parties knew how to create a document evidencing a loan if that was their intent.  Upon review, the Court finds that the Bankruptcy Court's finding was not clearly erroneous based on the evidence presented.  "The absence of notes or other instruments of indebtedness is a strong indication that the advances were capital contributions and not loans."  *Id.* at 750.  The lack of a promissory note combined with the demonstrated knowledge that the parties knew how to create a promissory note weighs in favor of a capital contribution.

The Bankruptcy Court found that the second and third factors lean towards a loan.  The Agreement provides a maturity date of July 25, 2002.  The Agreement also provides for 10% cumulative interest.  Appellants argue that the Bankruptcy Court did not give full legal effect to these factors because they do not lean toward a loan, but strongly support a loan.  Appellee argues that these factors are actually inconsistent as to whether they evidence a loan or a capital contribution, because the Agreement provides for "10% cumulative interest while the $1,000,000 is invested payments to be made when bank says we can take money out," and also provides for a "10% annual profit" with "[p]ayments to be made when the debt service covenant is met and the bank allows money to be taken out."  Appellee argues these provisions of the Agreement shows that repayment is linked to the profitability of the business or approval by senior lenders, instead of being mandatory, which is indicative of a capital contribution.  Appellants reply that the lack of interest payments demonstrates Dani/Darlington's financial difficulties and that it is

---

not appear to attribute any weight to the fact that the Agreement uses the term "investment" instead of "loan," the Court finds it unnecessary to address appellants' arguments.

the commitment to pay interest at the outset which matters most.

Upon review, the Court finds that the Bankruptcy Court did not clearly err in determining that factors two and three only lean toward the characteristics of a loan instead of strongly support a loan.  The evidence shows that the Agreement demonstrates some inconsistencies with a loan in that the interest payments are based on the success of the business from the outset of the transaction.

The Bankruptcy Court found that factor four, source of repayments, leans toward a capital contribution.  The Agreement provides the following:

> -The principal investment is to be returned to Gordon on or before 7/25/2002.  Collateral for this shall be a 50% interest in P.S. Realty.  This 50% profit/interest in P.S. Realty shall only be due and payable only if the principle investment of $1,000,000.00 towards the Darlington Nursing Home is not paid on or before 7/25/2004 [sic].
>
> -10% cumulative interest while the $1,000,000.00 is invested payments to be made when bank says we can take money out.

Appellants argue that this factor does not support a capital contribution because bank clearance for payments applies only to the interest payments, and the sentence that addresses repayment of the principal is unconditional.  Appellants further argue that even as to the interest payments, the provision merely states that the bank must be paid first, and additionally, there is no showing that the bank ever precluded taking money out to pay interest.  Appellee argues the source of the repayment of the loan is linked to the profitability of the business, which is a characteristic of a capital contribution.

Upon review, the Court finds that even taking as true appellants' argument that the provision requiring bank clearance applies only to interest payments, the Court cannot find that

17

the Bankruptcy Court clearly erred in finding that factor four supports a capital contribution. Appellants' argument that the provision means only that the bank must be paid first is unsupported in the Agreement.  Accordingly, the Court finds that factor four leans towards a capital contribution.  Further, the Bankruptcy Court also found that factor four, combined with appellants' lack of collection efforts (discussed below), neutralized the effects of factors two and three.  As appellants have not shown that factors two or three should be given more weight than factor four or appellant's lack of collection efforts, the Court finds that the Bankruptcy Court did not clearly err in finding that these factors neutralize each other.

The Bankruptcy Court found no evidence was presented as to factor five, the adequacy of capitalization, and thus attributed no weight to it.  Appellants argue that the Bankruptcy Court erred, as the Dani operating agreement shows that a Canadian corporation invested $1 million in Dani Family, and the Agreement itself shows the debtor was obtaining bank financing, which indicates a loan.  Upon review, the Court finds that this evidence does not establish the adequacy or inadequacy of capitalization, thus the Bankruptcy Court did not clearly err in not attributing weight to this factor.

The Bankruptcy Court found that factor six, the identity of interest between the creditor and the stockholder, leaned slightly toward a loan.  Appellants disagree, arguing that this factor strongly evidences a loan, as the disproportion between the percentage of ownership and the amount of money advanced was extreme.  Appellee argues that the Bankruptcy Court did not also consider that Schwartz was actively involved in the day-to-day operations of Dani/Darlington, while appellants had no involvement.  Appellee further argues that this was not an arm's length transaction, making it less likely that it was a loan.  Upon review, the Court

18

agrees with appellants that appellee has cited no basis in law for considering the degree of the Schwartz's involvement in the day-to-day operations of the company. The Court, however, agrees with the Bankruptcy Court that this factor only leans slightly toward a loan, as the record in this case indicate that it was not an arm's length transaction by any stretch of the imagination, thus reducing the impact of the disproportion between the percentage of ownership and the amount of money advanced. *Id.* at 750 ("We note that the more a transaction appears to reflect the characteristics of . . . an arm's length negotiation, the more likely such a transaction is to be treated as debt." (internal quotation and citation omitted)).

The Bankruptcy Court found that factor seven, the security for the advances, did not weigh in favor of finding the transaction to be a loan to Dani/Darlington because Dani/Darlington did not own the collateral, P.S. Realty. Appellants argue that collateral for a loan is often provided by third parties but provide no support for this statement. Appellants do cite to *Autostyle,* 269 F.3d at 752 for the proposition that third party "assistance" or guarantees are irrelevant, but the court in *Autostyle* was addressing the corporation's ability to obtain outside financing, not the ownership of collateral. Accordingly, the Court finds that the Bankruptcy Court did not clearly err in finding that the existence of collateral not owned by Dani/Darlington did not support a loan to Dani/Darlington.

The Bankruptcy Court found that appellants presented no evidence on factor eight, the corporation's ability to obtain outside financing. Appellants strongly disagree, arguing that the record shows the following with respect to outside financing: the petition of debtor Dani shows that it obtained in excess of $3 million in lender financing from LaSalle Bank; the confirmed plan provides for repayment of the loans to LaSalle Bank; and the Agreement through its

19

provisions shows outside financing.  Appellants also argue in connection with factor five that Dani/Darlington obtained $1 million from a Canadian corporation.  Appellee argues that no evidence exists that the Canadian corporation is an outside lending institution or that the $1 million advance was a loan, as opposed to a capital contribution.  Upon review, the Court finds that the Bankruptcy Court erred in holding that there was no evidence on Dani/Darlington's ability to obtain outside financing.  The petition and the plan are adequate evidence to show that Dani/Darlington received loans from LaSalle Bank, and the parties do not dispute that LaSalle Bank is an outside lender.  This factor weighs in support of a loan.  The Court does not give any weight to the $1 million advance of the Canadian corporation as no evidence exists that it was anything other than a capital contribution.

The Bankruptcy Court found that factor nine, the extent to which the advances were subordinated to the claims of outside creditors, reflected a capital contribution.  The Bankruptcy Court based its finding on email exchanges culminating in a June 13, 2007 letter which reflected the understanding of Schwartz and appellants that appellants would not be repaid until after payments were made to the mortgagees, secured creditors, and trade creditors.  Appellants argue that the Bankruptcy Court erred in relying on these exhibits, as the Bankruptcy Court ruled during the hearing that it would not use Exhibits 18-28 with regard to the meaning of the original document, with regard to "behavior after the fact," or with regard to subordination.  Appellants further argue that under the confirmed plan, appellants' claim may not be subordinated. Appellants finally argue that the exchange of correspondence between attorney Harry Brown and Gertrude Gordon was the product of "an extreme conflict of interest and improper legal advice by attorney Brown and may not be enforced nor recognized."

20

Appellee argues that the communications between Gertrude Gordon and Brown show that appellants understood they had an investment in Dani/Darlington, not a loan, and that they would be paid after the bank and trade creditors.  Appellee further argues that appellants are free to pursue their unethical behavior claim against Brown in another forum and that even if Brown's conduct was wrongful, it does not change the fact that appellants had only an equity interest in Dani/Darlington.  Appellee also argues that appellants misconstrue the nature of the Bankruptcy Court's ruling with respect to Exhibits 18-28, in that the parties agreed that subordination under 11 U.S.C. § 510(b) was not presently before the Bankruptcy Court, not that Exhibits 18-28 could not be relied upon to weigh the *Autostyle* factors.

Upon review, the Court finds that the Bankruptcy Court did not clearly err in finding that factor nine reflects a capital contribution.  As an initial matter, appellants have complained throughout these proceedings in both the Bankruptcy Court and in this Court that Brown's conduct in allegedly advising Gertrude Gordon of her rights under the Agreement was conflicted and "illegal" and that any decisions she made on appellants' behalf as a result of such advice should not be recognized or enforced.  Such an argument is wholly inappropriate in this case, which is not an action against the attorney.  As such, appellants' voluminous arguments on these grounds are rejected.  Additionally, appellants' disingenuous argument that the confirmed plan is *res judicata*, does not provide for further subordination, and thus appellants' claim could not be subordinated is not well-taken, as the *Autostyle* factors refer to subordination of the claim to other creditors pursuant to agreement with the parties involved prior to the bankruptcy context. *Id.* at 752.

The Court finds nothing in the record indicating that the Bankruptcy Court used Exhibits

18-28 inappropriately in considering the *Autostyle* factors.  Exhibits 18-28 represent an exchange of communications between Brown, appellants, and Gertrude Gordon for the purpose of obtaining appellants' approval for the sale of Dani/Darlington to Orion, as required of all equity holders in the operating agreement.  These exhibits reflect Gordon's understanding that appellants had an equity investment in Dani/Darlington and that appellants expected to be paid after bank creditors and trade creditors.  (See Exhibits 26 and 28.)  Given this evidence, the Court finds that factor nine indicates a capital contribution.

The Bankruptcy Court found that no evidence was presented as to factors 10 and 11, the extent to which the advances were used to acquire capital assets, and the presence or absence of a sinking fund to provide repayments.  The parties do not argue that the Bankruptcy Court erred with respect to these factors.

The Bankruptcy Court also found that the Schedules K-1, which reflected the $1 million advance as a capital contribution, supported its finding that the transaction was a capital contribution.  Appellants argue that the K-1s only "slightly" show equity, "if at all."  In support, appellants argue that they were young and inexperienced and did not notice the line item on their K-1s nor appreciate its consequence, and as such it is "an unfair consequence in the extreme" for the Bankruptcy Court to hold that appellants acted as though the advance was a capital contribution because they never disputed the treatment of the advance on the K-1s.  Appellants further argue that the K-1s are binding only for tax purposes and not for determining substantive rights concerning the company, and that appellants never received any tax benefits from the treatment of the advance as a capital contribution.  Upon review, the Court agrees with the Bankruptcy Court that the Schedules K-1 evidence a capital contribution.  Appellants' arguments

to the contrary are at best disingenuous and at worst purposely misstate the law.[8]

Finally, the Bankruptcy Court found that appellants' failure to try to collect loan payments under the Agreement evidenced a capital contribution, and together with factor four neutralized factors two and three.  Appellants argue that Gertrude Gordon testified that she did not sue Dani/Darlington because she feared pushing it into bankruptcy thus jeopardizing her children's claim, that enforcement efforts would have been futile, and that Dani/Darlington's inability to pay should not prejudice whether the transaction was a loan or a capital contribution. Appellee argues that Gertrude Gordon's fear of suing to collect on the debt is inconsistent with her aggressive behavior concerning the sale of Dani/Darlington referenced in Exhibits 18-28, in which Gordon demands that others "kick in" money for her to sign off on the deal on appellants' behalf.  Upon review, the Court finds that the Bankruptcy Court did not clearly err in determining that appellant's lack of action to recover loan payments reflected a capital contribution.  The Bankruptcy Court was in the best position to evaluate Gertrude Gordon's testimony, evaluate her credibility, and weigh the testimony against the other evidence.

The Bankruptcy Court found, based on the analysis of the *Autostyle* factors in this case along with the other evidence, that to the extent the $1 million transaction was with Dani/Darlington at all, it at most was a capital contribution.  This Court agrees.  The one factor as to which the Bankruptcy Court erred does not tip the balance in favor of a loan, especially in

---

[8] The case cited by appellants in support of their proposition that Schedules K-1 are binding for tax purposes but not for determining substantive rights concerning the company, *Plante v. Comm'r of Internal Revenue,* 168 F.3d 1279 (11th Cir. 1999), at most stands for the much more general proposition that "[w]hen a taxpayer characterizes a transaction in a certain form, the Commissioner may bind the taxpayer to that form for tax purposes."  It does not address Schedules K-1 nor does it address substantive rights concerning a company.

light of the fact that this was not an arm's length transaction.  Accordingly, the holding of the

Bankruptcy Court is affirmed.

**3.      Did the Bankruptcy Court err in holding that the Gordons had abandoned a new claim by not presenting it at trial, where the Bankruptcy Court had denied the motion for leave to file the new claim, had expressly stated at oral argument that the trial would be limited to the original claim, and had repeated at trial that the only issues before the Bankruptcy Court were issues involved in the original claims, not the new claim?**

Through this assignment of error, appellants attempt to re-argue what this Court has

already decided in its Memorandum of Opinion and Order affirming the Bankruptcy Court's

order denying appellants' Motion to File New Claim.  (Case No. 5:09 CV 1506, Doc. 26.)  These

underlying issues have already been determined by this Court, thus appellants' arguments are

barred by collateral estoppel and will not be addressed a second time.  Accordingly, the

judgment of the Bankruptcy Court is affirmed.

**4.      Did the Bankruptcy Court err in holding that the trustee-appellee's exhibit list at the trial should be stricken, where the exhibit list was relevant to Issue #3 above because it showed the trustee's own understanding that the trial was limited to the original claim, not the new claim?**

The Court reviews this issue for abuse of discretion.  The Bankruptcy Court found that

the document should be stricken from the appellate record because the exhibit list was not

relevant to the Bankruptcy Court's substantive ruling and because it is not necessary to afford a

complete understanding of the record on appeal, thus the exhibit list was not a necessary part of

the record on appeal.  *See In re National Century Financial Ents.,* 334 B.R. 907 (S.D. Ohio

2005).  Appellants argue that the Bankruptcy Court erred because the exhibit list was relevant to

show that appellee understood the evidentiary hearing was limited to appellants' original claim

and did not include appellants' new claim.  Appellants further argue that simply because the

Bankruptcy Court did not use the exhibit list in reaching its decision does not mean that it would not be useful on appeal.  Appellants also argue that a document need not be entered into evidence to be part of the record on appeal.  Finally, appellants argue that the document was filed pursuant to Bankruptcy Rule 5005(a)(1).  Notably, appellants cite no law in support of any but their final argument.

Upon review, the Court finds that the Bankruptcy Court did not abuse its discretion in determining that the exhibit list should be stricken from the record on appeal, as "[o]nly items that bear[] on the proceedings below and [are] considered by the bankruptcy judge in reaching [the] decision shall be included in the record on appeal."  *Id.* at 917 (internal quotations and citation omitted).  As the Bankruptcy Court did not consider the exhibit list in reaching its decision, the exhibit list may not be included in the record on appeal.  Accordingly, the judgment of the Bankruptcy Court is affirmed.[9]

**CONCLUSION**

For the foregoing reasons, the September 30, 2009 Memorandum of Opinion and Order of the Bankruptcy Court sustaining the trustee's objection to appellants' claim, and the May 12, 2010 Order of the Bankruptcy Court granting the Liquidation Trustee's Motion to Strike are AFFIRMED.

IT IS SO ORDERED.

---

[9]     The Court thus finds it unnecessary to reach appellee's argument that striking the exhibit list from the record on appeal was at most harmless error.

25

/s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 9/28/10